FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 26 2018

JAMES W. McCORMACK, CLERK
By:_____
                          DEP CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| CINDY GRAHAM, Derivatively on Behalf of Nominal Defendant WINDSTREAM HOLDINGS, INC., | ) ) ) ) Case No. *4:18-CV-709-SWW* |
| Plaintiff, | ) ) |
| v. | ) ) |
| ALAN L. WELLS, TONY THOMAS, SAMUEL E. BEALL, III, JEANNIE H. DIEFENDERFER, JEFFREY T. HINSON, WILLIAM G. LAPERCH, JULIE A. SHIMER, MICHAEL G. STOLTZ, WALTER L. TUREK, CAROL B. ARMITAGE, LARRY LAQUE, MARC F. STOLL, and BOB GUNDERMAN, | ) ) ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) |
| Defendants, | ) ) This case assigned to District Judge *Wright* ) and to Magistrate Judge *Kearney* |
| - and - | ) ) |
| WINDSTREAM HOLDINGS, INC., | ) ) |
| Nominal Defendant. | ) ) |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Cindy Graham ("Graham" or "Plaintiff"), by and through her undersigned counsel, brings this action derivatively on behalf of Nominal Defendant Windstream Holdings, Inc. ("Windstream" or the "Company") against certain current and former members of Windstream's Board of Directors (the "Board") and executive officers, seeking to remedy breaches of fiduciary duties related to the false and materially misleading statements they caused Windstream to file with the U.S. Securities and Exchange Commission ("SEC") and otherwise communicate to shareholders. Plaintiff makes these allegations upon personal knowledge, as to the facts of her ownership of Windstream stock, and upon information and belief, as to all other matters, based upon an in-depth review of: (a) public filings made by Windstream and other related parties and non-parties with the SEC; (b) press releases and other publications disseminated by the Company and other related non-parties; (c) news articles, shareholder communications, and postings on Windstream's website concerning the Company's public statements; (d) the proceedings in a related federal securities class action currently pending in the U.S. District Court for the Eastern District of Arkansas, captioned *Murray v. EarthLink Holdings Corp.*, No. 4:18-cv-00202 (the "Securities Action"); and (e) other publically available information concerning Windstream and the Individual Defendants (defined below).

## I.   NATURE OF THE ACTION

1.   This is a shareholder derivative action brought on behalf and for the benefit of Windstream against the Individual Defendants, including each member of Windstream's current Board, for breaches of fiduciary duties of loyalty, good faith, and candor arising from the disloyal and dishonest management of Windstream at the time of, and following, its merger with EarthLink Holdings Corp. ("EarthLink") (the "Merger"), and for falsely and misleadingly portraying Windstream's business as strong, its debt as stable, and its dividend as continuing (if not growing) following the Merger in violation of the federal securities laws.

2.      Windstream is a provider of network communications for consumers, businesses, enterprise organizations, and wholesale customers.

3.      On February 27, 2017, following shareholder approval, Windstream completed its merger with EarthLink, a leading provider of data, voice, and managed network services to retail and wholesale business customers and nationwide Internet service to residential customers.  In effecting the Merger, each share of EarthLink common stock was exchanged for 0.818 shares of Windstream common stock.  In the aggregate, Windstream issued approximately 93 million shares and assumed approximately $435 million of EarthLink's long-term debt, which the Company refinanced, in a transaction valued at approximately $1.1 billion.

4.      To garner support for the Merger, the Individual Defendants caused Windstream (and EarthLink for that matter) to represent to shareholders in a Joint Prospectus (defined below) regulated by the federal securities laws that Windstream's business was, and will continue to be, strong, that the Merger will enable Windstream to have greater financial flexibility for debt reduction, and that its dividend was stable, if not likely to increase, post-Merger.  Specifically, the Joint Prospectus claimed – albeit falsely – that "the merger[] will create a stronger, more competitive national telecommunications provider," "the transaction will . . . allow[] greater financial flexibility for strategic network investments and debt reduction and provid[e] support for the continued payment of Windstream's existing dividend after closing of the transaction," and that its "Dividend Practice[] [was to] Maintain Windstream annual dividend of $0.60 / share."

5.      Yet, immediately following the close of the Merger, Windstream began posting weak financial results, which continued throughout the rest of 2017 and into 2018.  This naturally led analysts and stockholders alike to express concern about Windstream's declining business.

6.      Indeed, on March 1, 2017, a mere two days after the Merger closed, Windstream issued its 2016 fourth quarter and fiscal year consolidated financials that revealed Windstream missed revenue estimates by a wide $30 million.  This revelation let Moody's, citing "the company's weak 2016 results and 2017 guidance,"  to change its rating on Windstream's debt from "stable" to "negative" and *Seeking Alpha* to comment that the Company's "results didn't exactly help [its] investment thesis" and that they "add[ed] to general concerns about its declining business."

7.      By August 2017 the story worsened.  In complete defiance of its commitment to at least maintain and pay Windstream's current dividend, which shareholders of both EarthLink and Windstream relied on to form the basis of their votes on the Merger, the Individual Defendants shocked the market and eliminated Windstream's dividend while also causing Windstream to report a whopping $68 million loss for the second quarter of 2017.

8.      Analysts quickly observed the severity of this news, explaining how the loss of Windstream's dividend was a death knell for the Company.  For example, on August 3, 2017, the same day Windstream's divided was eliminated, *Seeking Alpha* released an article, entitled "The Death Of Windstream," which explained that "the reason people owned this name, or other high risk telecoms, is for the bountiful dividend. . . . The Problem? The elimination of the divided is enough for most investors to throw in the towel."

9.      Likewise, in November 2017, following news of Windstream's receipt of a notice of default from holders of certain Senior Notes, analysts warned of Windstream's "critical condition," observing that "the reason the stock tanked, aside from facing extreme competitive pressures and financial issues, is that the company had eliminated its dividend all together back in August."

3

10.     In concealing the truth about Windstream's faltering business, its unstable debt, and its disappearing dividend, the Individual Defendants have breached their fiduciary duties to the Company and its stockholders and caused the Company to violate federal securities law. As a result of these breaches, the Company faces millions of dollars in potential liability and costs associated with the related Securities Action, which alleges similar false and misleading statements in the Registration Statement (defined below) and Joint Prospectus. Windstream's Board has not, and will not, commence litigation against the Director Defendants (defined below), nor will they vigorously prosecute such claims because they face a substantial likelihood of liability for their misconduct. Additionally, the Director Defendants face a substantial likelihood of liability to Windstream for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred, or is likely to occur, related to the false and misleading statements used to induce EarthLink and Windstream shareholders to approve the Merger. Accordingly, a pre-suit demand upon the Board is a useless and futile act. Thus, Plaintiff brings this action on Windstream's behalf.

## II.     JURISDICTION AND VENUE

11.     This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because the claims asserted arise under §§14(a) and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78n(a) and 78cc(b)).

13.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.

14. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

15. This Court has personal jurisdiction over each Defendant because each Defendant has committed acts related to the claims at issue in this Complaint within this District.

16. Venue is proper in this District because Nominal Defendant Windstream is headquartered in this District, in Little Rock, Arkansas, and a number of the Individual Defendants are citizens of the State of Arkansas. Additionally, venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.

## III. PARTIES

### A. Plaintiff

17. Plaintiff Graham is a shareholder of Windstream and has continuously held her shares at all times relevant hereto. Plaintiff will continue to hold Windstream shares throughout the pendency of this action. Plaintiff will fairly and adequately represent the interests in enforcing the rights of the Company. Plaintiff is a citizen of the State of North Carolina.

### B. Nominal Defendant

18. Nominal Defendant Windstream is a Delaware corporation with its principal executive offices located at 4001 Rodney Parham Road, Little Rock, Arkansas 72212. During the period in question, Windstream was a leading provider of advanced network communications and technology solutions for businesses across the United States, offering broadband, entertainment, and security solutions to consumers and small businesses primarily in rural areas in 18 states.

### C.    Director Defendants

19.    Defendant Alan L. Wells ("Wells") has served as a director of the Company since 2010 and serves as Chairman of the Board.  Defendant Wells was aware that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure, yet he caused Windstream to disseminate false and misleading statements, including in a false and misleading Joint Prospectus, concealing the truth.  Defendant Wells faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action.  Upon information and belief, Defendant Wells is a citizen of the State of Iowa.

20.    Defendant Tony Thomas ("Thomas") was appointed President and Chief Executive Officer ("CEO") and to the Board on December 11, 2014.  Previously, Defendant Thomas served as President-REIT Operations, Chief Financial Officer ("CFO"), Treasurer, and Controller for the Company.  Defendant Thomas was aware that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure, yet he caused Windstream to disseminate false and misleading statements, including in a false and misleading Joint Prospectus, concealing the truth.  Per Windstream's proxy statements, Defendant Thomas was not deemed "independent" under the applicable rules of the NASDAQ.  Defendant Thomas faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action.  Upon information and belief, Defendant Thomas is a citizen of the State of Arkansas.

21.    Defendant Samuel E. Beall, III ("Beall") has served as a director of the Company since November 2006 and currently serves on the Compensation Committee.  Defendant Beall was aware that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure, yet he caused Windstream to disseminate false and misleading statements, including in a false and misleading Joint Prospectus, concealing the truth.  Defendant

Beall faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action. Upon information and belief, Defendant Beall is a citizen of the State of Tennessee.

22. Defendant Jeannie H. Diefenderfer ("Diefenderfer") has served as a director of the Company since February 2016 and currently serves as Chair of the Governance Committee. Defendant Diefenderfer was aware that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure, yet she caused Windstream to disseminate false and misleading statements, including in a false and misleading Joint Prospectus, concealing the truth. Defendant Diefenderfer faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action. Upon information and belief, Defendant Diefenderfer is a citizen of the State of New Jersey.

23. Defendant Jeffrey T. Hinson ("Hinson") has served as a director of the Company since Windstream's formation in 2006 and is currently a member of the Governance and Audit Committees. Defendant Hinson was Chairman of the Board from May 2013 to April 2017, served on the Audit Committee from 2006 to May 2013, and was Chair of the Audit Committee from May 2010 to May 2013. Defendant Hinson was aware that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure, yet he caused Windstream to disseminate false and misleading statements, including in a false and misleading Joint Prospectus, concealing the truth. Defendant Hinson faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action. Upon information and belief, Defendant Hinson is a citizen of the State of Texas.

24. Defendant William G. LaPerch ("LaPerch") has served as a director of the Company since September 2014 and Chair of the Compensation Committee since May 2016.

7

Defendant LaPerch was aware that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure, yet he caused Windstream to disseminate false and misleading statements, including in a false and misleading Joint Prospectus, concealing the truth. Defendant LaPerch faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action. Upon information and belief, Defendant LaPerch is a citizen of the State of New York.

25.     Defendant Julie A. Shimer ("Shimer") was appointed to the Board on March 1, 2017 in connection with Windstream's merger with EarthLink. She serves as a member of the Governance and Audit Committees. Defendant Shimer previously served on EathLink's board of directors (the "EarthLink Board") from July 2013 to the closing of the merger and as Chair of the EarthLink Board. In this role, Defendant Shimer became aware, prior to the Merger, that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure. Defendant Shimer faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action. Upon information and belief, Defendant Shimer is a citizen of the State of New York.

26.     Defendant Michael G. Stoltz ("Stoltz") has served as a director of the Company since September 2014. Defendant Stoltz was aware that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure, yet he caused Windstream to disseminate false and misleading statements, including in a false and misleading Joint Prospectus, concealing the truth. Defendant Stoltz currently serves as Chair of the Audit Committee. Defendant Stoltz faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action. Upon information and belief, Defendant Stoltz is a citizen of the State of Colorado.

27.     Defendant Walter L. Turek ("Turek") joined the Board on March 1, 2017 in connection with Windstream's merger with EarthLink. He is a member of the Compensation Committee. Defendant Turek served on the EarthLink Board beginning in October 2015. In this role, Defendant Turek became aware, prior to the Merger, that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure. Defendant Turek faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action. Upon information and belief, Defendant Turek is a citizen of the State of Florida.

28.     Defendants Wells, Thomas, Beall, Diefenderfer, Hinson, LaPerch, Shimer, Stoltz, and Turek constitute all of the current members of the Company's Board and are collectively referred to herein as the "Director Defendants."

29.     Defendants Hinson, Shimer, and Stoltz are collectively referred to herein as the "Audit Committee" or "Audit Committee Defendants."

30.     Defendants Diefenderfer, Hinson, and Shimer are collectively referred to herein as the "Governance Committee" or "Governance Committee Defendants."

**D.      Former Director and Current Executive Defendants**

31.     Defendant Carol B. Armitage ("Armitage") served as a director of the Company from 2007, through Windstream's merger with EarthLink, until May 22, 2018, when the Board reduced the number of directors serving the Company. Defendant Armitage was aware that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure, yet she caused Windstream to disseminate false and misleading statements, including in a false and misleading Joint Prospectus, concealing the truth. Defendant Armitage faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a

named defendant in the Securities Action. Upon information and belief, Defendant Armitage is a citizen of the State of New York.

32.     Defendant Larry Laque ("Laque") served as a director of the Company from February 9, 2016, through Windstream's merger with EarthLink, until May 22, 2018, when the Board reduced the number of directors serving the Company. Defendant Laque was aware that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure, yet he caused Windstream to disseminate false and misleading statements, including in a false and misleading Joint Prospectus, concealing the truth. Defendant Laque faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action. Upon information and belief, Defendant Laque is a citizen of the State of Virginia.

33.     Defendant Marc F. Stoll ("Stoll") joined the Board on March 1, 2017 in connection with Windstream's merger with EarthLink and remained a director until May 22, 2018, when the Board reduced the number of directors serving the Company. Defendant Stoll served on the EarthLink Board beginning in April 2016. In this role, Defendant Stoll became aware, prior to the Merger, that Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure. Defendant Stoll faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action. Upon information and belief, Defendant Stoll is a citizen of the State of California.

34.     Defendant Bob Gunderman ("Gunderman") was appointed CFO for Windstream in 2014. Defendant Gunderman has held numerous leadership roles within the Company and is currently responsible for overseeing Windstream's accounting, financial, capital planning, tax, procurement, audit, investor relations, and treasury teams. Defendant Gunderman was aware that

10

Windstream's business was facing significant challenges, its debt was unstable, and its dividend was not secure, yet he caused Windstream to disseminate false and misleading statements concealing the truth. Defendant Gunderman faces a substantial likelihood of liability, as a result of the misconduct alleged herein, and is a named defendant in the Securities Action. Upon information and belief, Defendant Gunderman is a citizen of the State of Arkansas.

35.    Director Defendants and Defendants Armitage, Laque, Stoll, and Gunderman are collectively referred to herein as the "Individual Defendants."

36.    Nominal Defendant Windstream and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES AND OBLIGATIONS

### A.    Duties of All Individual Defendants

37.    By reason of their positions as directors and fiduciaries of Windstream, and by virtue of their ability to control the business and corporate affairs of the Company, each of the Individual Defendants owed, and owes, Windstream and its shareholders the fiduciary obligations of loyalty, good faith, and candor and were, and are, required to use their utmost ability to control and manage the Company in a lawful, fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Windstream and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

38.    Each Individual Defendant owes to Windstream and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39.     At all times relevant hereto, each Individual Defendant was the agent of each of the other Individual Defendants, and of the Company, and was at all times acting within the course and scope of such agency.

40.     By virtue of their fiduciary duties of loyalty, good faith, and candor, each Individual Defendant was required to, among other things:

      a.    exercise good faith to ensure that Windstream's affairs were conducted in an efficient, business-like manner;

      b.    exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, requirements, and all contractual obligations, including acting only within the scope of its legal authority;

      c.    when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

      d.    remain informed as to how the Company conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith.

41.     Further, the Individual Defendants who were, and are, members of the committees of Windstream's Board, assumed the responsibility to carry out the functions of their committees.

42.     The Individual Defendants knowingly or consciously breached their fiduciary duties of loyalty and good faith.  They did so by causing themselves or allowing other Individual Defendants to cause Windstream to falsely and misleadingly represent that Windstream's business was solid, its debt was stable, and its dividend would be maintained, if not grow, following the

Merger. This misconduct has caused Windstream to be damaged both financially and reputationally.

43. Furthermore, by virtue of their positions of control and authority as directors and/or officers of Windstream, the Individual Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent each other from their misconduct.

44. Windstream's bylaws, articles of incorporation, corporate governance guidelines, and Code of Conduct, as well as Board committee charters, specifically set forth the duties and obligations that Windstream Board members and/or officers are required to fulfill on behalf of the Company.

45. According to Windstream's Corporate Governance Board Guidelines ("Governance Guidelines"), the Board's duty extends "to monitor[ing] and provid[ing] oversight to . . . management, on behalf of the Company's stockholders, related to the business and affairs of the Company, and . . . to otherwise discharge all duties and responsibilities imposed upon directors of the Company by law or regulation."[1] Importantly, the "Board of Directors retains full oversight responsibility for all subject matters not assigned to the Committees in their charters, including *risks presented by business strategy, competition, regulation, general industry trends including the disruptive impact of technological change, capital structure and allocation, and mergers and acquisitions*." [Emphasis added]. In addition, the Governance Guidelines expressly encourage Board members to bring managers into Board meetings and state that "Board members

---

[1]     All of Windstream's corporate governance documents referenced or quoted herein are available on the Company's website at http://investor.windstream.com/index.php/corporate-governance; and http://investor.windstream.com/index.php/corporate-governance/committee-composition.

should have complete access to the management and such independent advisors as the Board determines are necessary to discharge the Board's duties and responsibilities."

46.     Windstream also maintains an ethics and compliance code, known as the *Working with Integrity* guidelines (hereinafter, "Ethics Code"), which expressly states that "Windstream is committed to conducting business in a manner that is ethical and promotes the best interests of its stockholders, employees, and customers. Windstream expects every employee and member of the board of directors to be ethical and honest, comply with the law, and avoid any appearance of impropriety or conflict of interest." According to the Ethics Code:

> As a public company, Windstream is required to follow prescribed accounting principles and disclosure standards to report financial and other information accurately and completely. Windstream is also required to have appropriate internal controls and processes in place to ensure that financial and other disclosures comply with the law and Securities and Exchange Commission (SEC) regulations.
>
> \* \* \*
>
> All employees with any responsibility for the preparation of Windstream's public reports, including all employees involved in drafting, reviewing, and signing or certifying the information contained in those reports, have an obligation to ensure that Windstream's financial statements, filings and submissions with the SEC, and other public statements and disclosures are complete, fair, accurate, timely, and understandable.
>
> All financial books, records, and accounts must follow Windstream's system of internal controls, as well as all generally accepted accounting principles, laws, and regulations for accounting and public reporting. *You must accurately and completely record and report all information, and you must not assist anyone with recording or reporting any information in an inaccurate or misleading way*.

[Emphasis added].

## B.     Additional Duties on the Audit Committee Defendants

47.     Windstream has delegated additional responsibilities to the members of its Audit Committee, who are charged with:

> [A]ssist[ing] *the Board of Directors* in overseeing the quality and integrity of Windstream's accounting, auditing, internal controls, compliance and risk

14

assessment practices related to (i) the financial statements and financial reporting process including disclosure controls and procedures, (ii) the system of internal accounting and financial controls, ... (v) legal and regulatory compliance monitoring and (vi) compliance with ethics programs established by Windstream's management and the Board of Directors.

[Emphasis added].

48.     Pursuant to the Audit Committee Charter, effective August 30, 2013 and amended

May 3, 2016 (the "Audit Charter"), the members of the Audit Committee, including each of the

Audit Committee Defendants, were and are responsible, among other things, for:

[R]eview[ing] Windstream's interim financial statements with Windstream's management and independent auditors prior to the filing of Windstream's Quarterly Report on Form 10-Q, including reviewing disclosures contained in the Management Discussion and Analysis of Financial Condition and Results of Operations section of the Form 10-Q. The Committee shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards, the federal securities laws and the NASDAQ rules. The Committee shall also review (i) management's disclosure to the Committee and the independent auditor under Section 302 of the Sarbanes-Oxley Act, including identified changes in internal control over financial reporting, and (ii) the contents of the Chief Executive Officer and the Chief Financial Officer certifications to be filed under Sections 302 and 906 of the Sarbanes- Oxley Act and the process conducted to support the certification.

[R]eview[ing] with Windstream's management and independent auditors the financial statements to be included in Windstream's Annual Report on Form 10-K (or the annual report to stockholders if distributed prior to the filing of Form 10-K), including the independent auditors' judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and the clarity of the disclosures in the financial statements.

* * *

[R]eview[ing] with Windstream's management and independent auditors:

- accounting principles applied by Windstream in connection with material accounting decisions and transactions, including material business acquisitions and dispositions;

* * *

15

[D]iscuss[ing] with Windstream's management Windstream's policy for earnings press releases, as well as for providing guidance and other financial information to analysts, rating agencies and other constituencies in the investment community.

* * *

[R]eport[ing] regularly to the Board of Directors on matters within the scope of the Committee, including any issues that arise with respect to the quality or integrity of Windstream's financial statements, Windstream's compliance with legal or regulatory requirements, . . . and any other issues the Committee believes merit the attention of the Board of Directors.

## V. SUBSTANTIVE ALLEGATIONS

49.     Windstream is a leading provider of advanced network communications and technology solutions for businesses and offers broadband, entertainment, and security solutions to consumers and small businesses across the United States.

50.     In 2014 and 2015, in addition to strategic business opportunities, Windstream began evaluating other unique ways to accelerate network investments and reduce debt. According to the Joint Prospectus, as part of Windstream's ongoing evaluation of business opportunities in the telecommunications industry and EarthLink's ongoing review and evaluation of its strategic plans and objectives, representatives of EarthLink and Windstream had several calls, meetings, and other communications in 2014 and 2015 regarding enhanced commercial agreements and/or various business combination alternatives, none of which resulted in any agreement or understanding with respect to a business combination.

51.     On September 1, 2016, Defendant Thomas and Non-party Joe Eazor ("Eazor"), EarthLink's CEO and President, had a call to discuss ongoing commercial negotiations regarding network access between the companies, the potential opportunity for a broader commercial arrangement, and whether a strategic business combination would be beneficial to the companies and their stockholders.

**A.**   **The Merger Is Approved by Each Company's Board of Directors After Current and Future Financial Information Made Available by Windstream's Board Is Reviewed**

52.   On November 7, 2016, EarthLink and Windstream formally announced the Merger,

listing as "**Compelling Strategic and Financial Benefits**":

> **Enhances [to Windstream's] balance sheet and increases [in] free cash flow:** Including run-rate synergies, on a pro forma basis for the 12 months ended Sept. 30, 2016, the combined company would have a net leverage ratio of 3.2x. Further, the transaction will be *significantly accretive* to Windstream's adjusted free cash flow *allowing greater financial flexibility* for strategic network investments *and debt reduction while increasing dividend coverage.*

[Emphasis added in bold and italics].

This followed a review of each company's current and future financial information.

53.   Indeed, approximately four weeks earlier, on October 3, 2016, Windstream and

EarthLink entered into a confidentiality agreement allowing each company the ability to share

non-public information regarding then-present financials and prospects.

54.   On October 4, 2016, members of EarthLink's and Windstream's management,

including Eazor and Defendant Thomas, met in Atlanta, Georgia, and discussed the companies'

respective businesses, including selected financial and other business information.

55.   On October 5, 2016, following a Windstream Board meeting, Windstream

submitted an indication of interest to EarthLink that contemplated a deal wherein each EarthLink

shareholder would receive 0.7 Windstream shares for every EarthLink share owned.  Purportedly,

according to the Joint Prospectus:

> In delivering the proposal, [Defendant] Thomas highlighted some of the reasons for EarthLink to consider a potential combination, including that the two companies *could create more value together than apart*, that EarthLink stockholders would own approximately 45% of the combined company, that substantial synergies would be expected from the combination and that the *amount of the dividend currently paid to EarthLink stockholders would likely increase following the transaction*.

[Emphasis added].

56.     The EarthLink Board met on October 7 and October 10, 2016 to review the proposed terms and to discuss Windstream's financial condition, including Windstream's representation that its dividend "would likely increase following the transaction." On October 10, 2016, the EarthLink Board submitted a counterproposal with a 0.8 exchange ratio and the following statement, underscoring the criticality of Windstream's dividend: "the parties must mutually agree before signing upon the dividend policy following the transaction, at the discretion of the Windstream Board."

57.     On October 11, 2016, Windstream submitted a counterproposal complete with a 0.75 exchange ratio and the following commitment concerning its dividend: "maintenance of Windstream's existing $0.60 per share dividend policy following the transaction, at the discretion of the Windstream Board."

58.     On October 12, 2016, EarthLink sought to secure more Windstream shares for current EarthLink shareholders and proposed an exchange ratio of 0.8.  Noticeably, EarthLink dropped the dividend language in its counterproposal.  Further, both EarthLink and Windstream exchanged and/or made available to one another additional non-public information for due diligence purposes and by providing the other access to their respective electronic data rooms. According to the Joint Prospectus, "[t]hereafter and continuing until the execution of the merger agreement on November 5, 2016, the management teams of Windstream and EarthLink, together with their respective financial, legal and accounting advisors, performed reciprocal due diligence reviews through a series of in-person and telephonic discussions and review of publicly available information and non-public information made available by each party."

59.     On October 29, 2016, Windstream verbally agreed to the 0.8 exchange ratio and confirmed the agreement in a revised draft merger agreement on October 31, 2016 – the terms of

which were later leaked to the market by Reuters in a November 4, 2016 article. According to public reports, EarthLink's CEO called Defendant Thomas to express concern over the market's reaction to the 0.8 exchange ratio.

60. By November 5, 2016, the exchange ratio was increased to 0.818 and the EarthLink Board, having reviewed Windstream's financial condition and prospects, unanimously approved the Merger.

**B.      While Soliciting Support for the Merger, the Individual Defendants Withheld Material Information from Shareholders in Violation of Their Fiduciary Duties and the Federal Securities Laws**

61. Eazor and Defendant Thomas first began soliciting support for the Merger in November 2016. Specifically, on November 7, 2016, both participated in an analyst call to discuss the status of Windstream's business and the Merger and stated, in relevant part: "[w]ith the achievement of the significant synergies, adjusted free cash flow increases meaningfully, *in addition to providing great coverage to -- greater coverage to the dividend*, the enhanced cash flow is supported by continuous strategic network investments and lower leverage." [Emphasis added].

62. As a result, Merrill Lynch posted a flash note on the same day stating: "We maintain our Buy rating, as we believe the dividend is secure and the current 8.3% yield is too high for the risk proposition the company presents." Furthermore, *24/7 Wall Street* wrote, explicitly based on the Individual Defendants' Merger-related statements, that "it appears that the super-high dividend is safe for now. That is what the company and analysts are telegraphing."

63. On November 18, 2016, again explicitly based on the aforementioned Merger-related statements regarding increasing dividend coverage, Cowen & Company reported:

> Windstream management remained adamant that the $0.60/share dividend is still important. Windstream further pointed to the advantages of higher FCF (and improved coverage) that the merger will provide, which not only secures the

19

dividend but makes it less of a burden as the influx of FCF will allow for plenty of capital discretionary opportunities such as de-leveraging, network expansion and other growth-related spending.

64.    Cowen & Company also stated that they "came away more confident in . . . subsequent meaningful FCF growth (and dividend coverage) that we believe will ultimately get the stock to work."

65.    With these misperceptions of Windstream's dividend stability permeating through the market, the Individual Defendants, on December 8, 2016, caused Windstream to file a registration statement on Form S-4 with the SEC, registering 95,959,386 shares of Windstream common stock in connection with the Merger (the "Registration Statement"). This was later amended on January 9, 2017 and January 13, 2017 and declared effective on January 17, 2017.

66.    On January 24, 2017, the Individual Defendants caused Windstream (and EarthLink) to file with the SEC a joint prospectus, dated January 23, 2017, which was mailed to both Windstream and EarthLink shareholders on January 25, 2017 (the "Joint Prospectus"). The Joint Prospectus incorporated and formed a part of the Registration Statement and was offered to shareholders of both companies to form the basis of their vote for the Merger.

67.    In violation of §14(a) of the Exchange Act, the January 23, 2017 Joint Prospectus contained materially false and misleading statements and omissions.

68.    The Joint Prospectus misleadingly represented that Windstream, post-Merger, would have greater financial flexibility, debt reduction, and the ability to continue to pay Windstream's existing dividend all the while becoming a stronger, more competitive national telecommunications provider capable of creating greater value for stockholders. Specifically, despite knowing otherwise, the Joint Prospectus stated that Windstream's Board, in consultation with Windstream's management, viewed the following factors as supporting their decision, and their recommendation to shareholders, to vote "**FOR**" the Merger:

20

- ***the mergers will create a stronger, more competitive national telecommunications provider . . .***;

- ***the combined company will have greater potential to create value for stockholders*** than Windstream would otherwise have on a stand-alone basis . . .;

- ***the expectation that the transaction will be significantly accretive to Windstream's adjusted free cash flow per share, allowing greater financial flexibility for strategic network investments and debt reduction and providing support for the continued payment of Windstream's existing dividend after closing of the transaction***;

* * *

- the expectation that the similar operating structures and goals of the two companies will drive advancement of products and services . . . ***allowing the combined company to be a stronger competitor in a market*** dominated by larger telecommunication providers;

* * *

- its knowledge of Windstream's business, operations, financial condition, earnings and prospects and its knowledge of EarthLink's business, operations, financial condition, earnings and prospects, taking into account the results of Windstream's thorough due diligence review of EarthLink conducted by its management team, key personnel and its advisors; [and]

- the projected financial results of Windstream and EarthLink as standalone companies and the fit of the transaction with Windstream's strategic goals[.]

[Emphasis added].

69.     In addition, the Joint Prospectus included a table of "**Unaudited Comparative Per Share Data**," which described both the historical and pro forma numbers for both companies. Twice, the Joint Prospectus stated that "***[p]ro forma [is the] same as historical, as no change in Windstream's dividend policy is expected as a result of the mergers.***" [Emphasis added].

70.     Further, the Joint Prospectus touted the "fairness opinion[s]" of financial advisors working on behalf of either Windstream or EarthLink.  In the case of Windstream, the Company engaged Barclays who, on November 5, 2016, concluded that the deal was fair and rendered its

oral opinion (which was subsequently confirmed in writing) to the Windstream Board, who incorporated it by reference and attached it to the Joint Prospectus.   In arriving at its opinion, Barclays expressly stated that it "assumed and relied upon the accuracy and completeness of the financial and other information [it] used . . . without any independent verification of such information . . . [and] upon the assurances of management of [Windstream] that they [were] not aware of any facts or circumstances that would make such information inaccurate or misleading in any material respect."   The Joint Prospectus also stated that Barclay's opinion provided support for Defendants' recommendation to shareholders that they vote "FOR" the Merger.

71.     Similarly, the Joint Prospectus stated:

Q:     **How does the Windstream Board recommend that Windstream stockholders vote?**

A:     The Windstream Board has unanimously approved the merger agreement and the transactions contemplated by the merger agreement, including the Windstream stock issuance and the Windstream charter amendment, and has ***determined and declared that they are advisable and are in the best interests of Windstream and its stockholders. The Windstream Board unanimously recommends that Windstream stockholders vote "FOR" the Windstream stock issuance proposal***, "**FOR**" the Windstream charter amendment proposal and "**FOR**" the Windstream adjournment proposal.

* * *

**The Windstream Board unanimously approved the merger agreement and the transactions contemplated thereby, including the Windstream stock issuance and the Windstream charter amendment, and has determined and declared that they are advisable and are in the best interests of Windstream and its stockholders. The Windstream Board unanimously recommends that the Windstream stockholders vote "FOR" the Windstream stock issuance proposal, "FOR" the Windstream charter amendment proposal and "FOR" the Windstream adjournment proposal.**

[Emphasis added in bold and italics].

72. Finally, the Joint Prospectus cautioned Windstream and EarthLink investors alike not to look elsewhere for information regarding each company or the Merger, stating, in relevant part:

> You should rely only on the information contained in or incorporated by reference into this joint proxy statement/prospectus. No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this joint proxy statement/prospectus. This joint proxy statement/prospectus is dated January 23, 2017, and you should assume that the information contained in this joint proxy statement/prospectus is accurate only as of such date. You should assume that the information incorporated by reference into this joint proxy statement/prospectus is only accurate as of the date of such information. Neither the mailing of this joint proxy statement/prospectus to EarthLink stockholders or Windstream stockholders nor the issuance by Windstream of shares of common stock pursuant to the merger will create any implication to the contrary.

73. These statements were false and misleading at the time they were made in the absence of the disclosure that Windstream: (1) was suffering worsening revenue trends and was on pace to significantly miss market expectations in its legacy business; (2) was seeing material declines in its wholesale and enterprise business sectors; (3) was observing increased and aggressive competition and price cuts by larger telecommunications service providers and cable operators; (4) did not have the operational capabilities, customer base, or products to reverse worsening revenue trends; (5) faced challenges in servicing its increasing debt load; (6) was experiencing deteriorating financial health; and (7) as a result of the above, was unable and unlikely to be able to continue to payout its existing dividend.

74. The same is true with respect to Windstream's subsequently circulated press release announcing the Merger and the presentation Windstream made available to shareholders and analysts discussing the Merger. The press release misleadingly claimed that the Merger "'*further advances Windstream's strategy by creating a stronger, more competitive business to serve our customers while increasing free cash flow and reducing leverage*[.]'" [Emphasis added].

Likewise, the presentation misleadingly claimed that the Merger, "*Improves Balance Sheet*," "*Reduces leverage, improves credit profile and provides more financial flexibility*," and that its "*Significant adjusted FCF accretion supports continued network investment, debt reduction and provides greater coverage of the dividend*." [Emphasis added]. Further, the presentation misleadingly affirmed Defendants' representation that post-Merger, they would "*[m]aintain Windstream annual dividend of $0.60 / share*" and that Windstream "*[c]ontinued to optimize [its] balance sheet by reducing debt and lowering interest cost*." [Emphasis added].

75.     Likewise, the Form 425 distributed by the Individual Defendants on February 8, 2017, to remind Windstream shareholders to vote for the issuance of Windstream stock to effectuate the Merger, was also misleading.  More specifically, Windstream's shareholders were told in the Form 425 that they could expect as a result of the Merger, among other things: "**Improve[ments] [in Windstream's] Balance Sheet[,]**" including in Windstream's "**credit profile**" and "**financial flexibility**," as well as "**[s]ignificant adjusted free cash flow accretion [that] supports continued network investment, *debt reduction and provides greater coverage of the dividend*.**" [Emphasis added in italics].

76.     Again, the statements highlighted in ¶¶66-67 were false and misleading at the time they were made in the absence of the disclosures identified in ¶60 above.

C.     **Contrary to the Representations Made in the Registration Statement and Joint Prospectus, Windstream's Financial Health and Dividend Stability Were Bleak at the Time of, and Following, the Merger**

77.     After considering the false and misleading information disseminated by the Individual Defendants in the Registration Statement, Joint Prospectus, and related public filings, EarthLink and Windstream's shareholders approved the Merger on February 24, 2017.

78.     On February 27, 2017, the Individual Defendants completed the Merger, causing Defendants Shimer and Turek to be appointed to Windstream's Board.

79.    Almost immediately, the promises of financial strength and dividend stability appeared fabricated, leading many analysts to question the financial condition of the Company. For example, on March 1, 2017, a mere two days after the close of the Merger when all were told things were good, the Individual Defendants caused Windstream to issue its 2016 fourth quarter and fiscal year consolidated results.  This led, on the very next day, to an article published on *Seeking Alpha* that noted how Windstream's most recent "results didn't exactly help the investment thesis" for the Company because "[t]he local telecom provider *missed revenue estimates by a wide $30 million*," which "*add[ed] to general concerns about a declining business*."  [Emphasis added].

80.    Then, on March 27, 2017, Moody's announced that it had changed its ratings on Windstream's debt from "stable" to "negative" after "the company's weak 2016 results and 2017 guidance."  Moody's concluded that Windstream's "downward trajectory of the business will persist and pressure Windstream's B1 rating."

81.    By May 2017 the situation worsened.  On May 4, 2017, Windstream reported disappointing results for the second quarter of 2017.  That same day, Defendant Gunderman admitted that Windstream had expected such headwinds, stating, in relevant part: "[w]holesale has been of a bit of a headwind in terms of the [Windstream] legacy services and the pressures. That's something that we expected, that's baked within our guidance for the year."  On the following day, Jefferies reported that "**Windstream reported disappointing results, missing both revenue and EBITDA expectations.**  . . .  Windstream suffered weak results, falling short of our estimates across every revenue category[.]"  Furthermore, on May 10, 2017, UBS reported on the Company's continued operational challenges, stating, in relevant part: "**Slow start to the year** . . . WIN's 1Q results showed continued operations challenges. Service revenues declined 6.6%, above

mgmt's guidance of ~4.4% for the yr. Revenues fell across all segments, incl. consumer at -0.3%, Enterprise at -2.6%, Carrier at -8.9%, ILEC SME at 5.9%, and CLEC SME at -17.8%."

82.    On May 31, 2017, Defendant Thomas all but admitted that these issues in Windstream's legacy business were known ***before*** the Joint Prospectus was disseminated to shareholders on January 25, 2017.  During the question and answer portion of his presentation at the Cowen Technology, Media & Telecom Conference, Defendant Thomas stated in response to a question about Windstream's second quarter performance compared to its first quarter, and a follow-up question about whether the "hiccup[s]" experienced had anything to do with EarthLink:

> ***There was no sales hiccup at EarthLink. We had a couple customers who were rural healthcare funded that lost their funding on January 1. So that was a little bit of a hiccup, but that was actually legacy Windstream, nothing to do with EarthLink. So that was a little bit of noise in the numbers in 1Q that created a little more pressure.*** But I still look forward in what I would call no fundamental changes in the business.

[Emphasis added].

83.    Similar statements were made by Defendant Gunderman about a week later during the Barclays High Yield Bond and Syndicated Loan Conference on June 8, 2017.  During the conference, Defendant Gunderman described increased competitive pressure, aggressive pricing from competitors, and headwinds in additional areas of the business, including Windstream's carrier and wholesale lines, stating, in relevant part:

> Yes, and I think you hit on 2 things that have certainly been a headwind in our carrier and wholesale business. The consolidation and grooming that's occurring with our peers and our customers and certainly impacted our top line. I often say the same thing that we are doing on behalf of our enterprise and SMB businesses, where we buy access from other carriers, well, that's their wholesale revenues. We're doing the same thing to them. That's happening to us at some level. We spend a lot more than we sell in access services, and so there's a little bit of a hedge there. ***The other thing that certainly happened on the wholesale business is pricing compression has occurred.*** As bandwidth consumption has gone up at a pretty rapid pace, the pricing per bandwidth has certainly come down. And so we've seen some of that sort of yield pressure, if you will, happen within wholesale. I'm proud of what the team has done in terms of selling more new logos and selling

more bandwidth to the content companies, to some extent, the cable companies who are now competing more aggressively on the enterprise side, where they don't have network. . . . We're doing a good job with that in expanding our network to capture those opportunities. I think that's going to pay dividends in the future for us. *But in the near term, what we're seeing is the repricing and the renewal of our base. It's just been too much for us to overcome on top line, and we're still feeling some pressure on that this year.*

[Emphasis added].

84.     Defendant Gunderman also revealed that the Company knew and "expected" increased competitive pressures and aggressive pricing from national cable competitors to occur – two facts noticeably missing from the Registration Statement and Joint Prospectus.  Indeed, during the question and answer portion of the conference, and in response to a question about Comcast following an unanswered question about the different segments of the business, Defendant Gunderman stated, in relevant part:

So cable competition has been no less. It's -- Comcast and Charter are our 2 biggest competitors, actually, Charter being the largest at over 30% overlap for our business, Comcast in the kind of mid-teens range. After that, it falls off pretty significantly from the national cable competitor standpoint. Around 20% of our footprint today has no cable competition. *And so where we see cable competition at the national level, they have been aggressive. Charter, in particular, has been an aggressive competitor. I wouldn't say that, that unexpected. We did expect them to get -- stay competitive in their markets, and they overlap with us.* These markets are Lexington, Lincoln, some of those places. Those are also places where we have brought more speed capability to the marketplace, to get more on parity with what they're offering. *But it's aggressive. I mean, there's an aggressive push out there with pricing, promoting price that's pretty low for the first year.* We're doing the same thing. I think we're holding our own in those areas. As you look at our opportunity in those markets, we actually have what I call insurgent market share now because of some of the share losses that have happened over the past number of years. And so we've been able to be aggressive with our pricing and really come after that share and try to win it back, and that's what we'll continue to [do]. And then in the more rural markets, which is still a very significant part of our footprint, we could be more defensive in really protecting our base but also growing our base of customers in that wallet share that we have out there. And so that's how we've gone into market recently.

[Emphasis added].

27

85.     In reality, however, the Company was not "holding [its] own," and by August 2017, the Individual Defendants caused Windstream to announce the end of its quarterly stockholder dividend effectively immediately.     At the same time, the Individual Defendants caused Windstream to report a remarkable *$68 million* loss for the second quarter of 2017 (compared with net income of $1.5 million a year prior) and that Windstream's operating income was $107 million, *down 31%* from $155 million the previous year.

86.     These announcements sent shockwaves throughout the financial media with many focused on the impact the loss of the dividend had on Windstream and its stockholders.  For example, *Seeking Alpha* published an article on its website, entitled "The Death Of Windstream," which explained that "the reason people owned this name, or other high risk telecoms, is for the bountiful dividend. . . . The problem? The elimination of the dividend is enough for most investors to thrown in the towel."  And, in another article, entitled "Windstream Stock Tumbles as Dividend Eliminated," *24/7 Wall Street* wrote, in relevant part, that "[t]he company has missed profit estimates by big margins in each of the past four quarters and shares have plummeted from a high of $10.45 last September to below $3.50 this morning."  One analyst explained, "so much damage had been done to the stock that no management team would have ever knowingly done what they did if there hadn't been some house-on-fire problem inside the business that caused them to create such havoc to the equity market."

87.     *Seeking Alpha* followed up on its reporting in September 2017, publishing an article, entitled "Windstream: Full Panic Mode," which stated:

*Windstream sent the market into panic mode with a new capital allocation plan in August. ... Windstream made a surprise announcement to immediately eliminate the dividend and implement a stock buyback plan. The stock ended the prior day trading at $3.72 and has nearly lost 50% of the value as dividend investors flee the stock and the market extrapolates too many negatives from the dividend elimination.*

28

[Emphasis added].

On September 29, 2017, *Dividend.com* wrote that "[t]he 'nail in the coffin' for Windstream was when the company eliminated its dividend in early August[.]"

88.     Analysts were likewise unsuspecting and troubled by Windstream's cancelled dividend. For example, Jefferies slashed its price target for Windstream stock in half from $5.00 to $2.50 per share on August 4, 2017, emphasizing that "**Elimination of the Dividend Sends Investors Out The Door**" and stating that "investors sold the [Company's] shares aggressively on the news[.]" Jefferies also observed that Windstream suffered from more fundamental problems, writing that "**[t]he loss of high-margin legacy revenue, and declining broadband subscribers will continue to weigh on results and sentiment.**" Days later, on August 7, 2017, Deutsche Bank described the "headwinds across key segments," including "Residential share loss [and] SME/Enterprise slowdowns from slower spend[.]"

89.     On August 11, 2017, UBS issued an analyst report, entitled "Windstream Corporation: Dividend cut didn't solve all problems," which described Windstream's "weak 2Q results" and the "competitive pressures to continue to hurt the top-line[,]" stating, in relevant part:

> WIN's 2Q results remained weak, missing our estimated by ~1%. Service revenues fell 7.5% yoy, accelerating from a 6.6% decline in 1Q. Weakness was driven by Enterprise (down 4.7% vs. -3.9% in 1Q - as data revenues fell for the first time), and continued declines in other segments. Similarly, the 2017 revenue guide was lowered by ~2% and EBITDA by 1% (exc. $120M revenue and $20M contribution from Broadview).

90.     UBS added, "[w]e are concerned that challenging business trends along with sustained weakness in voice/wholesale continue to drive top line pressure. While management had identified new cost cutting and synergy opportunities, we believe this will not be sufficient to stabilize EBITDA." UBS also expressed concerned about Windstream's debt, stating, in relevant part, "[w]e believe capital intensity needs to remain at mid-teens to drive profitable revenue growth

29

on a sustainable basis, which combined with low-SD EBITDA declines does not leave much room for leverage to fall. . . . Despite the recent dividend cut, worries remain about the company's ability to stabilize the top line and de-lever over time."

91.     On September 7, 2017, while attending a conference, an analyst from Bank of America Merrill Lynch made the following statement to Defendant Gunderman, indicating that the dividend cut was a result of pre-existing problems that Windstream expected:

> And so, the equity market responded to the dividend cut with a 50% haircut on the stock. And I think, day 1, there was actually what I thought was maybe a fairly logical, for most of the day, fairly logical opposite reaction to the bond market, which was, okay, Windstream has more cash to deploy to the debt holders. It's a greater interest cover and the rest of it. *But then, all of a sudden, they [i.e., investors] didn't believe that anymore. They actually believed that . . . so much damage had been done to the stock that no management team would have ever knowingly done what they did if there hadn't been some house-on-fire problem inside the business that caused them to create such havoc to the equity market, and the bond market got scared.* Totally unanticipated on your part?

[Emphasis added].

92.     Defendant Gunderman responded, stating simply that "we were certainly surprised to see the reaction from the fixed income community [i.e., bond-holders]." Notably, Defendant Gunderman did not address whether the dividend cut itself was unexpected or unanticipated, nor did he assure the market that major, pre-existing problems were not present inside the business.

93.     Thus, the Individual Defendants deceived shareholders into believing that the Merger would be rewarding by misleadingly representing that the Company's post-merger dividend would remain the same if not increase, and that its business and financial health would be solid. However, as detailed herein, the truth was that the Individual Defendants knew, yet concealed, that Windstream's dividend was collapsing, its debt was increasingly unstable, and its business prospects were dismal *before* the Joint Prospectus was filed and used by shareholders to vote for the Merger.

D.      **The Headwinds Concealed by the Individual Defendants Continued to Cause Windstream to Post Disappointing Results in the Second Half of 2017 and into 2018, Leading Analysts to Further Question the Company's Financial Situation**

94.      The issues that plagued Windstream prior to and immediately following the Merger, including, but not limited to, the Company's worsening revenue trends and material declines in its legacy, wholesale, and enterprise business sectors due to increased and aggressive competition and price cuts, as well as its persistent challenges in servicing its increasing debt load, continued in the second half of 2017 and into 2018. Analysts, as a result, continued to cover the Company negatively.

95.      On October 18, 2017, *Seeking Alpha* published an analyst's article, entitled "Windstream: There's Blood on the Streets," which noted that "[s]hort interest in Windstream has spiked to an all-time high. . . . This indicates that market participants are betting on its stock to fall further. Its shares could stay distressed over the coming weeks due to the heightened selling pressure." The article continued:

> Shareholders of Windstream . . . have had a painful last few months. Value of their holdings in the company has depreciated by almost 50% over the last quarter. After such a drastic downtrend, it's natural to ask if selling pressure in the scrip has subsided by now. But that's unfortunately not the case here. Latest data filing reveals that short interest in the company has risen yet again to reach an all-time high. And this continuing increase in selling pressure suggests that shares of Windstream could fall further.

96.      The *Seeking Alpha* article also observed Windstream's fall from grace from being a conservative income play to a speculative investment, stating, in relevant part:

> Windstream has been posting dismal financials over the past few quarters. It has missed the lower end of analyst estimates in six of the past seven quarterly results and discussions about its potential bankruptcy are becoming popular in most investing forum with each passing week. . . . Windstream has gone from being a conservative income play to a speculative investment.

97.     Analyst sentiments remained the same following the Individual Defendants' release of Windstream's disappointing financial results for the third quarter of 2017.  For example, on September 26, 2017, following an announcement that Windstream received a default notice from holders of Windstream's 6 3/8% senior notes due 2023, Moody's reported that it "views this disclosure as a negative event that raises uncertainty around Windstream and which could further impede Windstream's ability to access the capital markets."  "If the issue is not resolved quickly and in favor of the company," the Moody's report continued, "Windstream could encounter difficulties accessing funds to refinance its debt maturities[.]"  In addition, Moody's stated that it "believes that Windstream's limited financial flexibility exposes it to a potential deterioration of liquidity if the issue drags on for a prolonged period, especially if negative market forces continue to be amplified by the disclosure of the notice of alleged default."[2]

98.     On November 3, 2017, Moody's again expressed concern by downgrading Windstream's debt to B2, reporting that the "outlook remains negative" because "Windstream's weak revenues and EBITDA continue to weigh on its ratings, with year over year declines in the 4% to 5% range."

99.     On November 13, 2017, Windstream's financial condition was characterized as "critical" by yet another *Seeking Alpha* analyst, whose report, entitled "Windstream Is In Critical Condition," observed that "[t]he reason the stock tanked, aside from facing extreme competitive pressures and financial issues, is that the company had eliminated its dividend all together back in August."

---

[2]     At the time of the filing of this action, litigation in the U.S. District Court for the Southern District of New York related to the alleged default remained active, with Windstream having conceded in Court filings that an Event of Default and any anticipated acceleration of debt would likely force Windstream into bankruptcy.

100.    In February 2018, following yet another disappointing financial quarter with the

Individual Defendants causing Windstream to claim a net loss of *$1.84 billion* for the fourth

quarter of 2017, or $10.26 per share, compared to a net loss of $87 million (or $0.94 per share) the

previous year, was "due to changes in long-term cash flow projections, driven by *recent*

operational results and future assumptions as well as changes in cost of capital assumptions."

[Emphasis added].   Moody's reaffirmed its negative outlook on the Company.   Indeed, in

explaining why it downgraded Windstream's debt to B3, Moody's stated:

> Moody's Investors Service, (Moody's) has downgraded the corporate family rating
> (CFR) of Windstream Services, LLC (Windstream) to B3 from B2 based on the
> company's *sustained weak operating trends and a challenging debt maturity
> profile*. Moody's has also downgraded Windstream's probability of default rating
> (PDR) to B3-PD from B2-PD, its secured rating to B3 from B2 and its unsecured
> rating to Caa1 from B3. Windstream's speculative grade liquidity rating (SGL)
> remains at SGL-2, reflecting good liquidity. *The outlook remains negative due to
> Moody's expectation of continued pressure on EBITDA, negative free cash flow
> including persistent restructuring costs, and low asset coverage relative to debt.*
>
> Windstream faces large debt maturities over $1 billion each in 2020 and 2021 and
> strong negative market sentiment that poses very high refinancing risk.
> Windstream's revenues and EBITDA declined 5.5% (pro forma) in 2017 versus
> 2016. Moody's expects this trend to continue in 2018 and pressure cash flow and
> liquidity. Management expects an improvement in EBITDA trend in 2018 and a
> return to growth in 2019. Absent a change in EBITDA trajectory, the company's
> credit profile will remain stressed.
>
> * * *
>
> Windstream's B3 corporate family rating reflects its scale as a national wireline
> operator with a large base of recurring revenues, *offset by high leverage, a
> declining top line and margin pressure. Moody's believes that Windstream faces
> a continued erosion of EBITDA and cash flows as a result of prolonged prior
> underinvestment.*

[Emphasis added].

101.    Come June 2018, some analysts noted that Windstream "has had an unpleasant

year, to say the least. Shares have shed three-quarters of their value in the past 12 months, as

competitive pressures, difficult technology transitions, and a high debt load sent investors into a

panic over possible insolvency." Others, following a request by Windstream of its shareholders to permit Windstream to assume more junior debt and amend its credit agreements, noted that "Windstream is having to do financial jujitsu just to keep itself afloat at the moment, all while posting net losses of $156 million in its most recent quarter."

102. On this news, Moody's downgraded Windstream's debt to "distressed" on June 19, 2018, citing the "company's expected failure to meet its debt service obligations due to its commencement of debt exchange offers at significant discounts to par value with respect to certain series of its senior notes for second lien notes." The Moody's report continued:

> Based on final acceptance levels and exchange allocations, Moody's expects this would constitute a distressed exchange and would represent a material amount of unsecured debt, likely totaling 12% or more of outstanding funded debt. Moody's views this planned action as evidence that Windstream's weak operating trends are worsening and that the company's ability to transition to approximately stable EBITDA is proving more difficult than previously anticipated. Furthermore, Moody's believes that Windstream's capital structure has become untenable and these exchanges aim to help the company delay or potentially avoid future payment defaults.

103. As of December 31, 2016, Windstream had over $4.8 billion in long-term debt outstanding, including current maturities. One year later, by December 31, 2017, Windstream increased its debt load to a staggering $5.8 billion in long-term debt outstanding, including current maturities.

## VI.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104. Plaintiff was a shareholder at the time of the conduct complained of herein, has continuously held shares of Windstream through the present, and will continue to remain a shareholder of Windstream throughout the pendency of this action. Plaintiff will adequately and fairly represent the interests of Windstream and its shareholders in enforcing its rights.

105. Plaintiff repeats, realleges, and incorporates by reference each and every allegation set forth as though fully set forth herein. In addition to those allegations, demand on the current

34

Board (comprised of Defendants Wells, Thomas, Beall, Diefenderfer, Hinson, LaPerch, Shimer, Stoltz, and Turek) would have been a futile act for at least the following reasons as set forth herein.

106.    Such a demand would be a futile and useless act because there is a reasonable doubt that a majority of the current nine-member Board is capable of making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

107.    A majority of the Board has a strong interest in refusing to bring the claims asserted by Plaintiff to protect themselves against a further substantial likelihood of liability for violating federal securities laws, which disqualifies them from considering a demand.  All of the Director Defendants sat on either the Windstream and/or EarthLink Boards during the relevant period, participated in the preparation of the false and misleading Registration Statement and Joint Prospectus, and caused the dissemination of the false and misleading Registration Statement and Joint Prospectus to shareholders who, in turn, used it to form the basis of their vote to approve the Merger.  As described above, these culpable directors face a substantial likelihood of liability for violating §14(a) of Exchange Act.  These statements harmed both Windstream and its shareholders by misleadingly forming the basis of their votes on the Merger.

108.    Moreover, the Joint Prospectus expressly states, as one of the few identified factors that the Windstream Board considered and concluded supported its decision to approve the Merger, that "the fact that nine members of the proposed twelve-member combined company board will be members of the existing Windstream Board and that [Defendant] Thomas will be the chief executive officer and [Defendant] Gunderman will be the chief financial officer of the combined company[.]"  To expect these same Board members to disinterestedly and independently consider a demand, seeking to hold themselves accountable for the misconduct alleged herein and

in the related Securities Action currently pending in the Eastern District of Arkansas, would be to plainly ignore their own concessions.

109.    Further, as detailed herein, the Director Defendants had an obligation to ensure that Windstream complied with the law that they actively shirked.   Faced with knowledge that Windstream's business was significant challenges, its debt was increasingly unstable, and its dividend, despite representations that it would be maintained, was evaporating, the Director Defendants caused or allowed the Company to issue materially false and misleading statements, including in both the Registration Statement and Joint Prospectus, which were used by shareholders to form the basis of their votes for the Merger, concealing the truth.

110.    Similarly, issuing a demand upon Defendant Thomas is a wasteful and futile act. According to the Company's latest proxy statement, the Board has determined that Defendant Thomas fails to meet the independence rules prescribed by the SEC and NASDAQ's listing standards.   Accordingly, demand is futile with respect to Defendant Thomas.

111.    To date, the Director Defendants have failed to seek to recover for the Company for any of the wrongdoing identified by Plaintiff herein.   For all these reasons, a majority of the current Windstream Board is incapable of independently and fairly evaluating a demand to bring an action against themselves and other Windstream executives.

## VII.   CLAIMS FOR RELIEF

**COUNT I**
**Violation of §14(a) of the Exchange Act**
**<u>Against All of the Individual Defendants</u>**

112.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

113.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

36

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R §240.14a-9(a).

114. The Individual Defendants exercised control over Windstream and caused Windstream to disseminate the false and misleading Registration Statement and Joint Prospectus. These materially misrepresented the Company's current and future business, debt, and dividend.

115. As stated herein, the Registration Statement and the Joint Prospectus contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. These false statements and omissions were essential links to the effectuation of the Merger and formed the basis of the Company's shareholders vote for the Merger.

116. The written communications made by the Individual Defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications were materially false and/or misleading and were provided in a negligent manner.

117. At all relevant times to the dissemination of the materially false and/or misleading Registration Statement and Joint Prospectus, the Individual Defendants were aware of/or had access to information showing that Windstream's business was facing significant challenges, its debt was increasingly unstable, and its dividend was not actually going to increase, much less be maintained.

118.    Windstream, as a result, has been injured by this conduct and is entitled to damages and equitable relief.

## COUNT II
### Violation of §29(b) of the Exchange Act
### Against All of the Individual Defendants

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

120.    The Director Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §14(a) of the Exchange Act.  The Individual Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because these Defendants violated §14(a) by issuing false and misleading reports to Windstream shareholders regarding the nature of, and responsibility for, violations of federal law and regulations.  All of the payments the Individual Defendants received are therefore voidable by Windstream under §29(b) of the Exchange Act.

121.    Windstream is in privity with the Individual Defendants with respect to the incentive compensation and fees provided by Windstream to these Defendants.  The Individual Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

122.    Windstream has been severely injured by the misconduct of the Individual Defendants.  Accordingly, Windstream is entitled to damages, *i.e.*, rescission of the incentives, compensation, and fees granted to the Individual Defendants.

## COUNT III
### Breach of Fiduciary Duty
### Against All of the Individual Defendants

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

124.    The Individual Defendants each owe (and owed) Windstream and its shareholders fiduciary duties of loyalty, good faith, candor, trust, and due care in managing the Company's affairs.

125.    As detailed above, the Individual Defendants breached their fiduciary duties by permitting Windstream, its directors, and officers to violate federal securities law, as well as the Company's own internal governance regulations.

126.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Windstream has been damaged, not only monetarily, but also with regard to its corporate image and goodwill, having deceived the market into approving the Merger on the grounds that post-Merger Windstream would be stronger, its financial flexibility would cover, at minimum, the Company's pre-Merger dividend, and its debt would be stable.  In addition, there is a possibility that Windstream will sustain additional monetary and reputational damages should the Securities Action progress.

127.    Plaintiff, on behalf of Windstream, has no adequate remedy at law.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Finding that a shareholder demand on the Windstream Board would have been a futile and useless act;

B.    Finding that the Individual Defendants have breached their fiduciary duties to the Company and its shareholders by violating federal securities laws and regulations;

C.    Against each of the Individual Defendants in favor of Windstream for the amount of damages sustained by Windstream, as a result of the breaches of fiduciary duties by each of the Individual Defendants, as alleged herein, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

39

D.      Requiring the Individual Defendants to return to Windstream all compensation and remuneration of whatever kind paid by Windstream during the time that they were in breach of the fiduciary duties they owed to Windstream;

E.      Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Windstream directors, officers, and employees do not engage in wrongful and illegal practices;

F.      Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

G.      Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

H.      Granting any such other further relief as the Court may deem just and proper.

## IX.   JURY DEMAND

Plaintiff demands a trial by jury.


DATED: September 26, 2018          **POYNTER LAW GROUP**


Scott Poynter, AR Bar No. 90077
400 W. Capitol Ave., Suite 2910
Little Rock, AR 72201
Telephone:  (501) 251-1587
Facsimile:  (501) 244-2614
scott@poynterlawgroup.com

Geoffrey M. Johnson
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile:  (860) 537-4432

gjohnson@scott-scott.com

Jonathan M. Zimmerman
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
jzimmerman@scott-scott.com

Joseph Pettigrew
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
jpettigrew@scott-scott.com

*Attorneys for Plaintiff Cindy Graham*

## VERIFICATION OF CINDY GRAHAM

I, Cindy Graham, make this Declaration, and, being duly sworn, depose and say:

I am the derivative plaintiff in this action.  I verify that I have reviewed the Verified Stockholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern myself, are true to my personal knowledge.  I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

I have not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to me; or (ii) reimbursement, by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

Dated: _9-18-18_

_Cindy Graham_
CINDY GRAHAM

Sworn to and subscribed before me this _18th_ day of September, 2018.

_Sylvia C. Cameron_
NOTARY PUBLIC Sylvia C. Cameron

My commission expires:

_July 2 2019_